No. 24-30035

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

TOWN OF VINTON,

Plaintiff—Appellee

v.

INDIAN HARBOR INSURANCE COMPANY; LEXINGTON
INSURANCE COMPANY; QBE SPECIALTY INSURANCE
COMPANY; STEADFAST INSURANCE COMPANY; UNITED
SPECIALTY INSURANCE COMPANY; GENERAL SECURITY
INDEMNITY COMPANY OF ARIZONA; OLD REPUBLIC UNION
INSURANCE COMPANY; SAFETY SPECIALTY INSURANCE
COMPANY,

Defendants—Appellants

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, LAKE CHARLES DIVISION
NO. 2:23-CV-00240

---

**APPELLANTS' BRIEF**

---

Sean P. Mount
Bryce M. Addison
DEUTSCH KERRIGAN, LLP
755 Magazine Street
New Orleans, Louisiana 70130
(504) 593-0669
(504) 566-4073 (Fax)

Raffi Melkonian
Thomas C. Wright
Eric B. Boettcher
Landon J. Francois
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056

smount@deutschkerrigan.com          (713) 572-4321
baddison@deutschkerrigan.com        (713) 572-4320 (Fax)
                                    melkonian@wrightclosebarger.com
                                    wright@wrightclosebarger.com
                                    boettcher@wrightclosebarger.com
                                    francois@wrightclosebarger.com

*Attorneys for Defendants—Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-30035

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

TOWN OF VINTON,

Plaintiff—Appellee

v.

INDIAN HARBOR INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; QBE SPECIALTY INSURANCE COMPANY; STEADFAST INSURANCE COMPANY; UNITED SPECIALTY INSURANCE COMPANY; GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA; OLD REPUBLIC UNION INSURANCE COMPANY; SAFETY SPECIALTY INSURANCE COMPANY,

Defendants—Appellants

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Counsel for Defendants—Appellants**

Thomas C. Wright
Raffi Melkonian
Eric B. Boettcher
Landon Francois
WRIGHT CLOSE & BARGER, LLP

Sean P. Mount
Bryce M. Addison
DEUTSCH KERRIGAN, LLP

**Defendants—Appellants**

**Indian Harbor Insurance Company.** Indian Harbor Insurance Company is a wholly-owned subsidiary of XL Specialty Insurance Company and a wholly-owned indirect subsidiary of XL Group Ltd.

**Lexington Insurance Company.** Lexington Insurance Company is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation. No public company has an interest of 10% or more in American International Group, Inc.

**QBE Specialty Insurance Company.** QBE Specialty Insurance Company is a wholly-owned subsidiary of QBE Holdings, Inc. and a wholly-owned indirect subsidiary of QBE Insurance Group Limited.

**Steadfast Insurance Company.** Steadfast Insurance Company is a wholly-owned subsidiary of Zurich American Insurance Company and a wholly-owned indirect subsidiary of Zurich Insurance Group Ltd.

**United Specialty Insurance Company.** United Specialty Insurance Company is a wholly-owned subsidiary of State National Insurance Company, Inc.

**General Security Indemnity Company of Arizona.** General Security Indemnity Company of Arizona is a wholly-owned subsidiary of SCOR Reinsurance Company.

**Old Republic Union Insurance Company.** Old Republic Union Insurance Company is a wholly-owned subsidiary of Old Republic International Corporation.

**Safety Specialty Insurance Company.** Safety Specialty Insurance Company is a wholly-owned subsidiary of Safety National Casualty Corporation and a wholly-owned indirect subsidiary of Tokio Marine Holdings, Inc.

## Counsel for Plaintiff—Appellee

Thomas M. Flanagan
Camille E. Gauthier
Kansas M. Guidry
FLANAGAN PARTNERS, LLP

Russell J. Stutes Jr.
Patrick J. Lavergne
STUTES & LAVERGNE, LLC

## Plaintiff—Appellee

Town of Vinton

/s/ *Raffi Melkonian*
Raffi Melkonian
***Attorney for Defendants—Appellants***

v

## STATEMENT REGARDING ORAL ARGUMENT

The Court should grant oral argument. This case involves an important interpretation of a federal treaty and statute. In addition, it is one of numerous cases presenting the issue coming before this Court—the Court's decision on this case will decide several others. Therefore, although the Court could resolve this case in Appellants' favor by applying *Bufkin Enterprises, L.L.C. v. Indian Harbor Insurance Company,* 96 F.4th 726 (5th Cir. 2024) (per curiam), it should also grant oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................iii

STATEMENT REGARDING ORAL ARGUMENT ..............................vi

TABLE OF CONTENTS ...................................................................vii

TABLE OF AUTHORITIES..................................................................x

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION....................................................................................4

STATEMENT OF the CASE...................................................................5

I.     Factual Background .........................................................................5

II.    Procedural History ..........................................................................7

SUMMARY OF THE ARGUMENT .......................................................13

ARGUMENT ........................................................................................15

I.    This Court reviews de novo a district court's denial of a motion to compel and refusal to stay proceedings pending arbitration. .............................................................................................15

II.    The Convention required the district court to enforce the Policy's arbitration provision. .....................................................15

    A.    The Convention is a federal treaty implemented by federal statute and preempts all relevant state law. ...........16

    B.    The Convention directly applies because the Policy's arbitration provision—collectively agreed to by both the Foreign Insurers and Domestic Insurers—meets all the requirements for enforcement under the Convention..........18

        1.    Federal law governs the interpretation of the Policy. ..................................................................20

a.    The application of the Convention and Chapter 2 of the FAA is a matter of federal law. ...............................................................20

b.    Even assuming the requirements for creating federal common law apply here, they are satisfied. ..............................................24

c.    Cases calling for the application of state law to issues of contractual interpretation are based on Chapter 1 of the FAA and are not applicable here. .................................................29

2.    Under federal law, the Policy is one agreement to which all the Insurers—domestic and foreign—are parties, and all the Insurers collectively agreed to its arbitration provision. .............................................34

3.    Alternatively, under New York law, the Policy is one overarching contract to which all the Insurers agreed. ...................................................................44

C.    Even if the Insurers' contracts were considered to be only separate, equitable estoppel would still mandate arbitration under the Convention. ......................................47

1.    *Bufkin* is dispositive of this case ................................47

2.    *Bufkin* correctly recognized that federal common law governs equitable estoppel under the Convention. ...........................................................52

3.    If any State's law of equitable estoppel is to apply, it is New York's, which mandates arbitration under the Convention. ................................................58

D.    At a minimum, the arbitration provision's delegation clause requires the Court to compel arbitration. ................62

viii

III.    Contrary to the district court's findings, neither Louisiana Revised Statutes § 22:868(A)(1) nor § 9:2778 prohibit the arbitration provision's choice of law clause. .................................. 64

CONCLUSION ................................................................................. 66

CERTIFICATE OF SERVICE ........................................................... 68

CERTIFICATE OF COMPLIANCE ................................................... 68

# TABLE OF AUTHORITIES

**Cases**

*5556 Gasmer Mgmt. LLC v. Underwriters at Lloyd's, London,*
  463 F. Supp. 3d 785 (S.D. Tex. 2020) .............................................. 62, 63

*Adriatic Fire Ins. Co. v. Treadwell,*
  108 U.S. 361 (1883) ........................................................................ 40, 41

*Aggarao v. MOL Ship Mgmt. Co.,*
  675 F.3d 355 (4th Cir. 2012) ................................................................ 56

*Applehead Pictures LLC v. Perelman,*
  80 A.D.3d 181 (N.Y. App. Div. 2010) ............................................... 46, 47

*Arthur Andersen LLP v. Carlisle,*
  556 U.S. 624 (2009) ..................................................................... passim

*Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG,*
  783 F.3d 1010 (5th Cir. 2015) .............................................................. 43

*Beiser v. Weyler,*
  284 F.3d 665 (5th Cir. 2002) ................................................................ 29

*Boyle v. United Technologies Corp.,*
  487 U.S. 500 (1988) ..................................................................... passim

*Brown v. Pacific Life Insurance Co.,*
  462 F.3d 384 (5th Cir. 2006) ................................................................ 54

*Budinich v. Becton Dickinson & Co.,*
  486 U.S. 196 (1988) ............................................................................. 21

*Bufkin Enterprises, L.L.C. v. Indian Harbor Insurance Company,*
  96 F.4th 726 (5th Cir. 2024) ......................................................... passim

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,*
  813 F.3d 1208 (9th Cir. 2016) .......................................................... 24, 39

*Cent. Pines Land Co. v. United States,*
  274 F.3d 881 (5th Cir. 2001) ................................................................ 29

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
    500 F.3d 571 (7th Cir. 2007) ........................................................ 29, 30

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
    748 F.3d 249 (5th Cir. 2014) ........................................................ 31, 35

*Degraw Constr. Grp., Inc. v. McGowan Builders, Inc.*,
    152 A.D.3d 567 (N.Y. App. Div. 2017) .............................. 60, 61, 63

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995) ........................................................................ 31, 34

*Francisco v. STOLT ACHIEVEMENT MT*,
    293 F.3d 270 (5th Cir. 2002) ...................................................... passim

*Franco v. Mabe Trucking Co.*,
    3 F.4th 788 (5th Cir. 2021) ........................................................... 21, 23

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu
    Stainless USA, LLC*,
    590 U.S. 432 (2020) ................................................................................ 57

*Gov't Emps. Ins. Co. v. Grand Med. Supp., Inc.*,
    No. 11 CIV. 5339 BMC, 2012 WL 2577577
    (E.D.N.Y. July 4, 2012) ................................................................. 62, 63

*Granite Rock Co. v. Int'l Board of Teamsters*,
    561 U.S. 287 (2010) .............................................................................. 24

*Grigson v. Creative Artists Agency, L.L.C.*,
    210 F.3d 524 (5th Cir. 2000) ..................................................... passim

*InterGen N.V. v. Grina*,
    344 F.3d 134 (1st Cir. 2003) ...................................................... 28, 30

*Jiangsu Beier Decoration Materials Co. v. Angle World LLC*,
    52 F.4th 554 (3d Cir. 2022) ................................................................ 57

*Kubala v. Supreme Prod. Servs., Inc.*,
    830 F.3d 199 (5th Cir. 2016) ..................................................... 63, 64

*La. ACORN Fair Hous. v. LeBlanc,*
  211 F.3d 298 (5th Cir. 2000) ...............................................................26

*Life of Am. Ins. Co. v. Aetna Life Ins. Co.,*
  744 F.2d 409 (5th Cir. 1984) ...............................................................65

*LMP Props., L.L.C. v. Interstate Fire & Cas. Co.,*
  No. 23-30833, 2024 WL 2988938 (5th Cir. June 14, 2024) ................50

*Mangaroo v. Nelson,*
  864 F.2d 1202 (5th Cir. 1989) .............................................................56

*McDermott Int'l, Inc. v. Lloyds Underwriters of London,*
  944 F.2d 1199 (5th Cir. 1991) .......................................................27, 29

*McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch,*
  923 F.3d 427 (5th Cir. 2019) ...............................................................22

*Miss. Band of Choctaw Indians v. Holyfield,*
  490 U.S. 30 (1989) ................................................................................21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (1985) ....................................................................... passim

*Morgan v. Sundance, Inc.,*
  596 U.S. 411 (2022) .........................................................................43, 44

*MouseBeltLabs Pte. Ltd. v. Armstrong,*
  674 F. Supp. 3d 728 (N.D. Cal. 2023) .................................................59

*Nehme v. Immigr. & Naturalization Serv.,*
  252 F.3d 415 (5th Cir. 2001) ..................................................... 14, 21, 23

*Noble Drilling Services, Inc. v. Certex USA, Inc.,*
  620 F.3d 469 (5th Cir. 2010) ...............................................................35

*OPE Int'l LP v. Chet Morrison Contractors, Inc.,*
  258 F.3d 443 (5th Cir. 2001) .........................................................66, 67

*Outokumpu Stainless USA, LLC v. Coverteam SAS,*
  No. 17-10944, 2022 WL 2643936 ............................................... passim

*Perry v. Thomas,*
 482 U.S. 483 (1987).........................................................................31, 32

*Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.,*
 2024-00449 (La. 6/19/2024), 386 So. 3d 306.......................................11

*Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.,*
 395 So. 3d 717 (La. 2024)............................................... 12, 13, 54, 55

*Polyflow, L.L.C. v. Specialty RTP, L.L.C.,*
 993 F.3d 295 (5th Cir. 2021).............................................................34

*Pontchartrain Nat. Gas. Sys. v. Tex. Brine Co.,*
 317 So. 3d 715 (La. Ct. App. 2020) ....................................................54

*Revis v. Schwartz,*
 185 N.E.3d 496 (N.Y. 2022) ...............................................................62

*Revis v. Schwartz,*
 192 A.D.3d 127 (N.Y. App. Div. 2020).................................................61

*S.K.A.V., L.L.C. v. Independent Specialty Insurance Co.,*
 103 F.4th 1121 (5th Cir. 2024) ................................................... 11, 13

*Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,*
 587 F.3d 714 (5th Cir. 2009)...................................................... passim

*Scherk v. Alberto-Culver Co.,*
 417 U.S. 506 (1974).............................................................. 17, 27, 29

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex),*
 767 F.2d 1140 (5th Cir. 1985).............................................................42

*Setty v. Shrinivas Sugandhalaya LLP,*
 3 F.4th 1166 (9th Cir. 2021) ................................................. 29, 55, 59

*Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,*
 198 F.3d 88 (2d Cir. 1999) .................................................................24

*Stone v. Doerge,*
 328 F.3d 343 (7th Cir. 2003)..............................................................34

xiii

*Sturdy Built Homes, L.L.C. v. Carl. E. Woodward L.L.C.*,
  82 So. 3d 473 (La. Ct. App. 2011) ........................................................ 54

*TBS Enters., Inc. v. Grobe*,
  114 A.D.2d 445 (N.Y. App. Div. 1985) ................................................ 46

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) .............................................................................. 26

*Todd v. Steamship Mutual Underwriting Association (Bermuda) Ltd.*,
  601 F.3d 329 (5th Cir. 2010) .......................................................... 32, 33

*United States v. Little Lake Misere Land Co.*,
  412 U.S. 580 (1973) .............................................................................. 57

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ................................................................................ 34

*Williams v. Mobil Oil Corp.*,
  83 A.D.2d 434 (N.Y. App. Div. 1981) ............................................. 46, 47

*Zimmerman v. International Companies & Consulting, Inc.*,
  107 F.3d 344 (5th Cir. 1997) .......................................................... 32, 33

**Statutes**

9 U.S.C. § 2 ............................................................... 31, 32, 34, 66

9 U.S.C. § 3 ............................................................................... 8

9 U.S.C. § 4 ............................................................................... 8

9 U.S.C. § 16 ............................................................................. 2

9 U.S.C. § 202 ................................................................... passim

9 U.S.C. § 203 ................................................................... passim

9 U.S.C. § 205 ............................................................... 2, 22, 25

9 U.S.C. § 206 ........................................................... 8, 18, 22, 25

15 U.S.C. § 1012(b) ................................................................. 10

28 U.S.C. § 1331 ................................................................2, 34

28 U.S.C. § 1332 ....................................................................2

28 U.S.C. § 1441 ....................................................................2

28 U.S.C. § 1446 ....................................................................2

La. Rev. Stat. § 9:2778 .................................................... passim

La. Rev. Stat. § 9:2779 ...........................................................66

La. Rev. Stat. § 22:1269 ..........................................................32

La. Rev. Stat. § 22:46 ...............................................................7

La. Rev. Stat. § 22:868 .................................................... passim

## Other Authorities

1 Gary B. Born, International Commercial Arbitration (3d ed. 2021) ..................................................................... passim

21 Richard A. Lord, *Williston on Contracts* (4th ed. 2024).. 23, 40, 41, 59

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 1970 WL 104417 ................................................................ 18, 25, 65

*Restatement (Second) of Contracts* § 1 (1981) ................................. 39, 40

*Tamar Meshel, Of International Commercial Arbitration, Non-Signatories, and American Federalism: The Case for a Federal* Equitable Estoppel Rule, 56 Stan. J. Int'l L. (2020) ..................... 23, 59

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction because this is an interlocutory appeal as of right from a district court's denial of a motion to compel arbitration and refusal to stay proceedings pending arbitration. 9 U.S.C. §§ 16(a)(1)(A)–(C). The district court had subject matter jurisdiction because Appellee sued Appellants in Louisiana state court and Appellants properly removed the case to the federal district court under 9 U.S.C. § 205 and 28 U.S.C. §§ 1331, 1441, and 1446 based on the district court's subject matter jurisdiction over the case (i) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 9 U.S.C. §§ 202, 203 and (ii) under 28 U.S.C. § 1332 because the matter in controversy exceeds the value of $75,000 and there is complete diversity between the parties.

## STATEMENT OF THE ISSUES

1.  The Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958 (the "Convention") requires a United States court to compel arbitration if there is an agreement in writing providing for arbitration in the territory of a Convention signatory and a party to the agreement is foreign. Here, a group of domestic and foreign insurers issued Vinton a property insurance policy that contained an arbitration provision to which all the parties collectively agreed. Moreover, the arbitration provision included a broad delegation clause. Did the Convention mandate that the insurers' motion to compel arbitration be granted?

2.  This Court recently held that the doctrine of equitable estoppel can be used to enforce arbitration agreements when a signatory to the contract containing the arbitration provision raises allegations of substantially interdependent and concerted conduct by both a non-signatory and one or more signatories. Vinton asserted an insurance claim against a group of domestic and foreign insurers, but then dismissed its claims against the foreign insurers to avoid the Convention.

Did equitable estoppel mandate the district court to compel arbitration under the Convention?

3.    The policy's arbitration clause calls for New York law to be applied in the arbitration. Louisiana Revised Statutes § 22:868 and § 9:2778 bar foreign choice of law clauses under certain circumstances, but the Convention and Federal Arbitration Act ("FAA") preempt § 22:868 and § 9:2778 and mandate that covered arbitration agreements be enforced according to their terms. Is (a) the choice of law issue delegated to the arbitration tribunal; and, (b) in the alternative, do the Convention and FAA require that the policy's choice of New York law be enforced?

## INTRODUCTION

This is another in a series of cases where a district court has refused to enforce an arbitration provision in a surplus lines insurance policy, despite it being required to do so under the insurance policy's text and a federal treaty. This Court should reverse the order below and compel arbitration. By doing so, the Court will not only resolve this case, but will also resolve the potentially dozens of similar cases where binding arbitration provisions risk being flouted. As of this writing, there are already seven other cases presenting the same issue before this Court. Many more may be coming.

The clearest path to reversal is to apply the Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958 and its implementing federal law. In general, that treaty requires arbitration agreements contained in any commercial agreement including a foreign party to be enforced. The arbitration agreement in this case includes foreign parties. That the plaintiff, Vinton, has attempted to distract from that fact by dismissing the foreign insurers is of no moment. Vinton signed an arbitration agreement with a group of insurers to get the best

pricing and coverage for its properties. It cannot change course now that it finds those obligations inconvenient.

The Convention is not the only path to enforcement here. But it is the clearest and most determinative. In all events, this Court should make clear that, because the Convention supersedes any conflicting state law, arbitration agreements that involve foreign parties and are covered by the Convention are enforceable regardless of state law to the contrary. To do otherwise would be to disregard this Nation's obligations under the Convention and to invite a flurry of federal litigation in cases that were intended by all parties to be arbitrated. The order below should be reversed.

## STATEMENT OF THE CASE

### I.   Factual Background

In March 2020, Town of Vinton ("Vinton"), domestic insurance companies Appellants Indian Harbor Insurance Company; Lexington Insurance Company; QBE Specialty Insurance Company; Steadfast Insurance Company; United Specialty Insurance Company; General Security Indemnity Company of Arizona; Old Republic Union Insurance Company; and Safety Specialty Insurance Company (collectively, the "Domestic Insurers"), and two foreign insurers—Certain Underwriters at

5

Lloyd's, London (the "Lloyd's Underwriters") and HDI Global Specialty SE ("HDI Global"; collectively with the Lloyd's Underwriters, the "Foreign Insurers"; and, collectively with the Domestic Insurers, the "Insurers"[1])—entered into a surplus lines commercial property insurance policy bearing Account No. 727947 (the "Policy") under which Insurers would insure Vinton's property in Louisiana. ROA.228–322. The Policy is structured as one overall policy, ROA.228, that contains component coverage parts supplied by policies from each Insurer. *See* ROA.228–286.

The Policy includes a broad arbitration provision mandating that "[a]ll matters in difference between [Vinton] and the [Insurers] . . . in relation to this insurance, including its formation and validity, . . . shall be referred to an Arbitration Tribunal" seated in New York and applying New York law. ROA.268. The arbitration provision further provides that a decision reached by the Arbitration Tribunal shall be binding and enforceable in a court of competent jurisdiction. ROA.268.

---

[1]    The Insurers note that the terms "Domestic Insurer" and "Foreign Insurer" as used in this brief are only shorthand terms for party names for purposes of this brief and do not refer to the definitions of those terms contained in Louisiana Revised Statutes § 22:46.

## II.  Procedural History

In August 2022, Vinton, violating the Policy's arbitration provision, sued the Domestic and Foreign Insurers in Louisiana state court for breaches of contract and the duty of good faith and fair dealing. ROA.21–26. Vinton alleged that the Insurers did not fully and timely pay Vinton's insurance claims submitted to all the Insurers for property and business losses arising out of damage related to Hurricane Laura in August 2020 and Hurricane Delta in October 2020. ROA23–24. Vinton requested that the state court temporarily withhold service of its petition on the Insurers, ROA.329, and quickly moved to dismiss the Foreign Insurers with prejudice. ROA.183–184. The state court dismissed the Foreign Insurers with prejudice before Vinton's petition was served on any Insurer. ROA.185.

The Domestic Insurers removed the case to the U.S. District Court for the Western District of Louisiana on federal question and diversity jurisdiction grounds. ROA.10–20. The case was assigned to the Honorable James D. Cain, Jr. ROA.5–6.

The Domestic Insurers moved to compel arbitration and stay the district court proceedings under 9 U.S.C. §§ 3, 4, and 206, explaining that

7

the arbitration provision in the Policy must be enforced under the Convention and also under the FAA. ROA.194–227. The district court denied the Domestic Insurers' motion to compel arbitration and stay the proceedings. ROA.722–739. The court first held that the Convention did not apply because the Domestic Insurers were not parties to an arbitration agreement having a foreign citizen as a party, a prerequisite for the Convention's applicability. According to the district court, each Domestic Insurer "[had] a separate contract with the insured" and, consequently, their arbitration agreements did not include the Foreign Insurers as parties. ROA.727–29 (Op. at 6–8).

The district court likewise concluded that the Convention did not apply under a theory of equitable estoppel. ROA.729–32 (Op. at 8–11) Under this Court's ruling in *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000) (and now *Bufkin Enterprises, L.L.C. v. Indian Harbor Insurance Company,* 96 F.4th 726, 729 (5th Cir. 2024)), equitable estoppel under federal common law can compel arbitration where "the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories

to the contract." *Grigson*, 210 F.3d at 527 (emphasis and quotation omitted). The district court, however, instead adopted Vinton's "heightened evidence" standard for equitable estoppel based on Vinton's status as a government entity. The district court held that equitable estoppel did not apply in this case because of the heightened standard and because Vinton had dismissed its claims against the Foreign Insurers with prejudice. ROA.731 (Op. at 10).

The district court also held that the FAA did not compel arbitration here because Louisiana Revised Statutes § 22:868(A)(2)—which provides that arbitration agreements in insurance contracts delivered in Louisiana are unenforceable—"reverse-preempted" the FAA under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), a federal statute that generally prevents federal statutes not specifically related to "the business of insurance" from preempting state statutes specifically enacted "for the purpose of regulating the business of insurance." ROA.732–738 (Op. at 11–17).

Last, the district court held that Louisiana Revised Statutes § 22:868(A)(1) and § 9:2778 barred provisions in the arbitration

9

agreement related to the application of New York law. ROA.738 (Op. at 17). The Domestic Insurers timely appealed. ROA.740–43.

Subsequently, in a different case, *Police Jury of Calcasieu Parish v. Indian Harbor Insurance Co.*, the same district court judge—seemingly attempting to avoid this Court's binding decision in *Bufkin*, which was released after the district court's order denying arbitration in this case—certified three questions to the Louisiana Supreme Court that covered (a) Louisiana Revised Statutes § 22:868; (b) Louisiana Revised Statutes § 9:2778; and (c) the interpretation of equitable estoppel under Louisiana law. *See Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.*, No. 2:24-CV-00342 (W.D. La. Apr. 9, 2024) (Cain, J.), ECF Doc. No. 22.

Appellants filed their opening brief in this case. *See* ECF Doc. No. 39. Later, the Louisiana Supreme Court granted certification of the district court's questions in *Calcasieu Parish*. *See Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.*, 2024-00449 (La. 6/19/2024), 386 So. 3d 306. This Court abated this case pending "the Louisiana State Supreme Court's decision in *Calcasieu Parish* and *S.K.A.V.*" *See* ECF Doc. No. 69-2. The latter reference was to this Court's withholding of the mandate in its decision in *S.K.A.V., L.L.C. v. Independent Specialty Insurance Co.*,

103 F.4th 1121 (5th Cir. 2024), a case involving Louisiana Revised Statutes § 22:868.

In October 2024, the Louisiana Supreme Court issued its opinion. *See Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.,* 395 So. 3d 717 (La. 2024). Answering the first question about the interpretation of Louisiana Revised Statutes § 22:868, the court held that Louisiana Revised Statutes § 22:868 prohibits the use of arbitration provisions in Louisiana insurance policies. *See Calcasieu Par.,* 395 So. 3d at 722–25. On the second question, the court held that Louisiana Revised Statutes § 9:2778 applies to all contracts with political subdivisions of Louisiana and that insurance policies issued to political subdivisions therefore cannot provide for the application of foreign law. *Calcasieu Par.,* 395 So. 3d at 725–28. The court declined to address the insurers' arguments that § 9:2778 is preempted by both the Convention and the FAA.

Last, on the third question, the court held that a domestic insurer cannot invoke the doctrine of equitable estoppel under Louisiana law to enforce an arbitration clause contained in a foreign insurer's policy. *Id.* at 728–30. The court noted that equitable estoppel "cannot prevail when in conflict with [Louisiana's] positive written law" and concluded that

11

"equitable estoppel is not available under these circumstances because it conflicts with the positive law of La. R.S. 22:868, which prohibits the use of arbitration clauses in Louisiana-issued insurance policies." *Id.* at 729. In so holding, the court expressly stated its disagreement with this Court's holding in *Bufkin*. *Id.* Incorrectly assuming that *Bufkin* concerned equitable estoppel under Louisiana law, and not federal law, the court stated that *Bufkin*'s holding was "not supported by Louisiana law" because this Court "failed to acknowledge that Louisiana has positive law" that conflicts with the application of equitable estoppel, Louisiana Revised Statutes § 22:868. *Calcasieu Par.*, 395 So. 3d at 730.

The upshot of the Louisiana Supreme Court's ruling is that under *Louisiana law*, Louisiana insureds may obtain the benefits of a surplus lines policy issued by a group that includes foreign insurers but then sidestep the policy's arbitration provision (and the Convention) through "pleading-and-then-dismissing gamesmanship." *Bufkin*, 96 F.4th at 732–33.

The *S.K.A.V.* Panel then denied the defendant-appellant's petition for rehearing en banc and issued the mandate. *S.K.A.V., L.L.C. v. Indep.*

12

*Specialty Ins. Co.*, No. 23-30293 (5th Cir.), ECF Doc. Nos. 112, 113. The Court then lifted this case's abatement. ECF Doc. No. 90.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's order denying the Domestic Insurers' motion to compel arbitration and stay the proceedings pending arbitration.

To begin, the Convention requires the enforcement of the Policy's arbitration provision because it (1) "is an agreement in writing to arbitrate" the claims asserted by Vinton; (2) provides for arbitration in New York (within the "territory of a Convention signatory"); (3) "arises out of a commercial legal relationship"; and (4) has "a party to the agreement [that] is not an American citizen" because the Foreign Insurers are parties to the Policy and the arbitration provision along with the Domestic Insurers. *Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 273 (5th Cir. 2002). Because the enforcement of the Convention entails the application of a treaty and the federal statutes implementing it, federal law, and not Louisiana law, governs the contractual interpretation of the Policy. *See Nehme v. Immigr. & Naturalization*

13

*Serv.*, 252 F.3d 415, 422 (5th Cir. 2001). "Congress does not make the application of a federal act dependent on state law." *Id.*

Further, even accepting the district court's erroneous conclusion that the Insurers' contracts are all separate, the doctrine of equitable estoppel would still mandate arbitration under the Convention. The Court's recent holding in *Bufkin* is dispositive. *Bufkin* involved the same arbitration language, the same relevant law, and many of the same parties, and this Court held that the Convention required the district court to compel arbitration even though the plaintiff had dismissed the foreign insurers. 96 F.4th at 729. *Bufkin*, moreover, correctly recognized federal common law governs the application of equitable estoppel to enforce the Convention.

Last, neither Louisiana Revised Statutes § 22:868(A)(1) nor § 9:2778 prevent enforcement of the substantive choice of law clause included in the Policy's arbitration provision. The Convention preempts § 22:868 and the Convention and the FAA preempt any anti-arbitration provisions in § 9:2778, which includes the prohibition of a foreign choice of law clause. In any event, that choice of law question is delegated to the arbitrators.

14

## ARGUMENT

**I.   This Court reviews de novo a district court's denial of a motion to compel and refusal to stay proceedings pending arbitration.**

This Court reviews de novo denial of a motion to compel arbitration. *Bufkin,* 96 F.4th at 729. A district court's decision not to enforce an arbitration agreement through the use of equitable estoppel is reviewed for abuse of discretion. *Id.* "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Id.* (quoting *Grigson*, 210 F.3d at 528).

**II.   The Convention required the district court to enforce the Policy's arbitration provision.**

The district court was required to grant the motion to compel. This result is required by a straightforward textual application of the Convention and the Policy. In addition, this Court's binding decision in *Bufkin* also controls. That case, which reversed the same district court's decision denying arbitration in substantively identical circumstances, controls because the federal common law doctrine of equitable estoppel mandates the Convention's enforcement. Finally, this Court could also reverse by holding that Vinton's challenges to the arbitration provision's

15

enforceability were delegated to the arbitration tribunal. In all events, the arbitration provision must be enforced.

**A. The Convention is a federal treaty implemented by federal statute and preempts all relevant state law.**

The Convention is an international treaty that guarantees citizens of signatory countries the right to enforce agreements to arbitrate disputes. The "goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). As most relevant here, the Convention provides:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

16

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 art. II(3), 21 U.S.T. 2517, 1970 WL 104417, at *1.

The Convention Act, the federal law implementing the Convention housed in Chapter 2 of the FAA, provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202. Chapter 2 of the FAA further provides that an "action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States," 9 U.S.C. § 203, and that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States," 9 U.S.C. § 206. This Court has long held that the Convention supersedes any conflicting state law, as the McCarran-Ferguson Act does not apply to the Convention. *See Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 718, 721–25, 729–32 (5th Cir. 2009) (en banc). That holding is consistent with the

17

"strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

**B.   The Convention directly applies because the Policy's arbitration provision—collectively agreed to by both the Foreign Insurers and Domestic Insurers—meets all the requirements for enforcement under the Convention.**

This Court has held that "[i]n determining whether the Convention requires compelling arbitration[,] . . . courts conduct only a very limited inquiry" and that courts "should compel arbitration if (1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Bufkin*, 96 F.4th at 730 (quotation omitted). To fail prong 4 of that test, the commercial relationship must be "*entirely* between citizens of the United States." 9 U.S.C. § 202 (emphasis added).

The Policy's broad arbitration provision is enforceable under the Convention and states that "[a]ll matters in difference between [Vinton] and the [Insurers] . . . in relation to this insurance, including its formation and validity, . . . shall be referred to an Arbitration Tribunal"

18

seated in New York and applying New York law. ROA.268. The provision makes no distinction between foreign and domestic insurers. The Policy's arbitration provision thus (1) "is an agreement in writing to arbitrate" the claims asserted by Vinton; (2) provides for arbitration in New York (within the "territory of a Convention signatory"); (3) "arises out of a commercial legal relationship"; and (4) has "a party to the agreement [that] is not an American citizen" because the Foreign Insurers are parties to the Policy along with the Domestic Insurers. *Bufkin*, 96 F.4th at 730 (quotation omitted).

Federal common law governs this issue and, under its principles, the Policy is structured as one overall policy that contains component coverage parts supplied by policies from each Insurer, with each Insurer being severally obligated for its component coverage part. The Policy is thus one agreement to which all the Insurers—domestic and foreign— are parties. Further, if state law instead determines whether the Policy is one contract, New York law would apply and dictate the same results.

19

### 1. Federal law governs the interpretation of the Policy.

#### a. The application of the Convention and Chapter 2 of the FAA is a matter of federal law.

Because the enforcement of the Convention entails the application of a treaty and the federal statutes implementing it, federal law governs the contractual interpretation of the Policy. Most fundamentally, this Court has recognized that in the "absence of plain language to the contrary, Congress does not make the application of a federal act dependent on state law." *Nehme v. Immigr. & Naturalization Serv.*, 252 F.3d 415, 422 (5th Cir. 2001) (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)). "Congress intends that federal statutes have a nationwide application," and "permitting state law to control a federal act might impair a federal program." *Id.* Thus, "'[a]lthough state law generally supplies the rules of decision in federal diversity cases, it does not control the resolution of issues governed by federal statute,'" and the "*Erie* doctrine is not implicated when a valid federal rule or statute directly governs the matter at issue." *Franco v. Mabe Trucking Co.*, 3 F.4th 788, 798 (5th Cir. 2021) (quoting *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 198 (1988)).

Here, the Convention—an international treaty—and Chapter 2 of the FAA—the chapter of the United States Code implementing the Convention—are articles of federal law that provide a body of substantive federal law intended for nationwide application. *See, e.g.*, *McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 431 (5th Cir. 2019). The Convention and Chapter 2 of the FAA mandatorily apply to govern all arbitration agreements that fall under the Convention. *See, e.g.*, *Safety Nat'l*, 587 F.3d at 722–25. Article II(1) and (2) of the Convention and § 202 of the FAA define which agreements fall under the Convention, and Article II(3) of the Convention and § 206 of the FAA provide the mechanism for compelling arbitration under covered agreements. What's more, Chapter 2 of the FAA expressly provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States," that federal district courts "shall have original jurisdiction over such an action or proceeding," and that a defendant may at any time before trial remove to federal court a state court action that "relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. §§ 203, 205.

21

In this highly federalized area, state law "does not control the resolution of issues governed by federal statute" and treaty, *Franco*, 3 F.4th at 798 (quotation omitted), and Congress plainly intends that the Convention and Chapter 2 of the FAA "have nationwide application," *Nehme*, 252 F.3d at 422. Likewise, the Convention and Chapter 2 of the FAA contain no suggestion, let alone "plain language," that Congress "[made] the application of [these] federal act[s] dependent on state law." *Nehme*, 252 F.3d at 422. Accordingly, issues concerning the formation or interpretation of international arbitration agreements covered by the Convention and Chapter 2 of the FAA are governed by federal law, not state law. *See Franco*, 3 F.4th at 798; *Nehme*, 252 F.3d at 422; Tamar Meshel, *Of International Commercial Arbitration, Non-Signatories, and American Federalism: The Case for a Federal Equitable Estoppel Rule*, 56 Stan. J. Int'l L. 123, 146 (2020).

A leading treatise on contract law summarizes, "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the implementing provisions of the FAA create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Convention." 21 Richard A. Lord, *Williston on Contracts*

22

§ 57:61 (4th ed. 2024) (footnotes omitted). Thus, under the Convention, "[g]eneral federal law, rather than the state law of the forum and its conflict of laws rules, governs the question whether an agreement to arbitrate was made." *Id.* Likewise, the Ninth Circuit has straightforwardly stated this principle: "Because this case arises under Chapter 2 of the Federal Arbitration Act, the issue of whether the Commercial Contract constituted a binding agreement is governed by federal common law." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016). So has the Second Circuit: "When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999), *abrogated on other grounds by Granite Rock Co. v. Int'l Board of Teamsters*, 561 U.S. 287, 296 (2010). And as a leading treatise on international arbitration explains, "[t]he better-reasoned decisions of U.S. courts . . . apply a judicially-fashioned body of federal common law, derived from the New York Convention and Chapter 2 of the FAA, to questions of formation and validity of international

23

arbitration agreements, rather than looking to either state or foreign law." 1 Gary B. Born, *International Commercial Arbitration* § 4.04[A][2][j][v](4), p. 587 (3d ed. 2021).

### b. Even assuming the requirements for creating federal common law apply here, they are satisfied.

As discussed, the application of federal law in interpreting the Policy and the parties to it flows directly from the text of the Convention and Chapter 2 of the FAA. *See* Convention art. II, 1970 WL 104417, at *1; 9 U.S.C. §§ 202, 203, 205, 206. This itself is justification for applying federal common law in interpreting the Policy.

But even assuming *arguendo* that applying federal law here requires "gap-filling" in a federal framework to provide substance to the interstices of federal authority through federal common law and that more doctrinal justification is therefore warranted, the result is the same. In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court stated "a two-part test for determining whether federal common law should apply over state law (or any other law for that matter)." *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *6 (11th Cir. July 8, 2022) (Tjoflat, J., specially concurring). First, the court must determine whether "uniquely federal

24

interests" are involved. *Boyle*, 487 U.S. at 504, 507; *see Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). Second, the court must determine whether a "significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." *Boyle*, 487 U.S. at 507 (alteration in original) (quotation omitted). Sometimes, such as "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* In other instances, "the conflict is more narrow, and only particular elements of state law are superseded." *Id.*; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 301 (5th Cir. 2000) ("Courts create federal common law when it is necessary to effectuate the intent behind a federal statute").

The issues presented here comfortably meet each part of the *Boyle* test. As to the first part, issues concerning the formation and interpretation of arbitration agreements under the Convention present a "quintessential 'uniquely federal interest.'" *Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring) (quoting *Boyle*, 487 U.S. at 507). As the Supreme Court explained long ago, the purpose of the

25

United States adopting and implementing the Convention was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n.15. The Court has further explained that, in applying the Convention, "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." *Mitsubishi Motors*, 473 U.S. at 629. "A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate" the purposes of the Convention, but would also "invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." *Scherk*, 417 U.S. at 516–17. And as this Court explained, "[t]o gain rights under the Convention, . . . Congress had to guarantee enforcement of arbitral contracts and awards made pursuant to the Convention in United States courts." *McDermott Int'l, Inc. v. Lloyds*

26

*Underwriters of London*, 944 F.2d 1199, 1207 (5th Cir. 1991). Indeed, "there is a strong federal interest in making sure that the United States lives up to its treaty obligations." *Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring). The application of the Convention and Chapter 2 of the FAA in courts across the country thus involve a "uniquely federal interest." *Boyle*, 487 U.S. at 507.

For the second part of the *Boyle* test, a "significant conflict" between federal common law and state law exists because uniformity in interpreting arbitration agreements falling under the Convention is a critical element of the Convention and Chapter 2 of the FAA and the "application of state law would frustrate" that uniformity. *Id.* "A central goal of the Convention—and the driving force behind Congress's enactment of chapter 2—was to set out uniform rules governing the recognition and enforcement of international arbitration awards," and [a]pplying varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2." *InterGen N.V. v. Grina*, 344 F.3d 134, 143 (1st Cir. 2003); *see Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring) ("[A]llowing each state . . . to impose its own test for threshold questions

27

of arbitrability would create an unmanageable tangle of arbitration law in the United States, lead to forum shopping, and frustrate the uniform standards the New York Convention and Chapter 2 of the FAA were enacted to create."). As this Court has explained, "[r]efusing to apply state law is appropriate when national uniformity is required, as well as when state law conflicts with federal interests." *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 890 (5th Cir. 2001) (footnotes omitted).

Thus, "the Supreme Court has recognized that in the context of the *New York Convention*, uniformity of the law is of *paramount* importance." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 580–81 (7th Cir. 2007) (emphases in original) (citing *Scherk*, 417 U.S. at 520 n.15); *see also Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) ("The New York Convention and its implementing legislation emphasize the need for uniformity in the application of international arbitration agreements."). This Court agrees: A reason "Congress favored federal jurisdiction over Convention-related claims" was "to promote the development of a uniform body of law under the Convention." *Beiser v. Weyler*, 284 F.3d 665, 672 (5th Cir. 2002) (citing *McDermott*, 944 F.2d at 1212).

28

Therefore, issues concerning the formation and interpretation of arbitration agreements under the Convention comfortably meet each part of the *Boyle* test, and the application of federal common law is proper. The "overarching federal concern with the uniformity of treatment of international arbitration agreements requires that the issue before [the Court] be resolved by a federal common law rule, rather than by a state rule of decision." *Argonaut Ins.*, 500 F.3d at 579; *see InterGen*, 344 F.3d at 143 ("If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision." (quotation omitted)).

> ### c. Cases calling for the application of state law to issues of contractual interpretation are based on Chapter 1 of the FAA and are not applicable here.

Although Vinton will likely claim otherwise, the conclusion that federal law governs here is not contrary to *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), and other caselaw holding that in typical FAA cases involving *domestic* arbitration agreements assessed under *Chapter 1* of the FAA, state contract law applies to the interpretation of arbitration agreements. *See id.* at 630–31 (explaining that in domestic cases under Chapter 1 of the FAA, "[s]tate law . . . is applicable to

29

determine which contracts are binding under § 2 and enforceable under § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" (quotations omitted)); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (stating that under Chapter 1 of the FAA, courts are generally to "apply ordinary state-law principles that govern the formation of contracts" when "deciding whether the parties agreed to arbitrate a certain matter"); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257–58, 261–62 (5th Cir. 2014) (following *Arthur Andersen* and ruling that state contract law principles apply to domestic arbitration agreements analyzed under Chapter 1 of the FAA). This is so because "Section 2—the FAA's substantive mandate—makes written arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds *as exist at law or in equity* for the revocation of a contract.'" *Arthur Andersen*, 556 U.S. at 630 (emphasis added) (quoting 9 U.S.C. § 2). That language does not apply to the Convention.

As the Supreme Court explained in *Perry v. Thomas*, 482 U.S. 483 (1987), "§ 2 provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the

30

passage of that statute." *Id.* at 492 n.9. Because an "agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law,* save upon such grounds as exist at law or in equity for the revocation of *any* contract," state law "is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Id.* (citations and quotation omitted). The application of state contract law in these domestic arbitration cases is therefore directly tied to the specific language of § 2, which serves as the "touchstone" for applying state contract law of these cases. *Id.* Section 2, of course, does not apply to international arbitration agreements that fall under the Convention and Chapter 2 of the FAA, as Convention article II and 9 U.S.C. § 202 govern those matters.

*Todd v. Steamship Mutual Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329 (5th Cir. 2010), does not undermine this conclusion. In *Todd*, this Court concluded that *Arthur Andersen* abrogated its decision in *Zimmerman v. International Companies & Consulting, Inc.*, 107 F.3d 344 (5th Cir. 1997), where the Court held that a plaintiff proceeding against his employer's insurer under Louisiana's direct action statute, La. Rev. Stat. § 22:1269, could not be compelled to arbitrate under the FAA

31

because he was not a party to the insurance policy containing the arbitration provision. *See Todd*, 601 F.3d at 332–35; *Zimmerman*, 107 F.3d at 346. The *Todd* Court so held because *Arthur Andersen* made clear that "nonsignatories to arbitration agreements (such as direct action plaintiffs) may sometimes be compelled to arbitrate." *Todd*, 601 F.3d at 333. The Court "remand[ed] Todd's action to the district court for a determination of whether Todd can be compelled to arbitrate now that *Zimmerman* has been displaced" and expressly stated that the balance of its opinion was to explain its rationale and "provide guidance for the district court on remand." *Id.* at 332. But although the Court stated in dicta that both FAA and Convention cases have "largely relied on the same common law" contract principles, it never held that state law applies in interpreting arbitration agreements under the Convention. *Id.* at 334–35.

Furthermore, the unique nature of the FAA also shows why state common law applies to contracts assessed under the FAA instead of the usual paradigm of federal law governing issues concerning a federal statute. As this Court has recognized, the FAA "is something of an anomaly in the realm of federal legislation: It bestows no federal

jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute." *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 301–02 (5th Cir. 2021) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009)). The FAA is not a full-fledged federal statute in that it requires other, independent sources of law before it comes into play—either state law claims giving rise to diversity jurisdiction or federal question claims. *See id.* Because the FAA is not an independent federal statute, it is sensible that general state-law principles of contract law apply to the formation and interpretation of arbitration agreements. *See* 9 U.S.C. § 2. Indeed, were it true that "any dispute about the scope or meaning of an arbitration clause must be resolved under federal law[,] . . . then any demand for arbitration would arise under federal law" and "support[] jurisdiction under 28 U.S.C. § 1331," obliterating the blackletter rule that the FAA does not bestow federal jurisdiction and that other sources of jurisdiction must be relied upon. *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003) (Easterbrook, J.).

Finally, it bears noting that after *First Options* and *Arthur Andersen*, "many U.S. lower courts have continued to apply substantive

rules of federal common law to the formation of international arbitration agreements that are subject to the New York Convention, as distinguished from domestic arbitration agreements." 1 Born, *International Commercial Arbitration* §4.04[A][2][j][v](4), pp. 583–84 (footnote omitted).[2] Simply stated, the "Court in *Arthur Andersen* did not address the application of the New York Convention or Chapter 2 of the FAA." *Id.* § 10.05[A], p. 1610.

> **2. Under federal law, the Policy is one agreement to which all the Insurers—domestic and foreign—are parties, and all the Insurers collectively agreed to its arbitration provision.**

As stated previously, the Policy's broad arbitration provision—that "[a]ll matters in difference between [Vinton] and the [Insurers] . . . in relation to this insurance, including its formation and validity, . . . shall be referred to an Arbitration Tribunal" seated in New York and applying New York law, ROA.268—meets every requirement for enforcement

---

[2]  Furthermore, shortly after the Supreme Court's *Arthur Andersen* decision in 2009, this Court issued *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469 (5th Cir. 2010), holding that federal law governed the application of equitable estoppel in a domestic arbitration case. *See id.* at 473. This Court's rule of orderliness "is strict and rigidly applied," *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021), and this Court's 2014 decision in *Crawford*, which held that state law governs equitable estoppel in a domestic arbitration case and does not mention *Noble Drilling*, apparently runs afoul of the rule, *see Crawford*, 748 F.3d at 257–58, 261–62.

under the Convention: "(1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Bufkin*, 96 F.4th at 730 (quotation omitted).

The district court's holding to the contrary is incorrect. The court concluded that the Policy was not one agreement, but instead merely ten separate agreements with each individual insurer, and that because the Foreign Insurers are not defendants in this case, there is no agreement with any foreign entity that provides for arbitration. ROA.727–29 (Op. at 6–8). This ruling clashes directly with both the contract and the statutory text. First, the entire framing is incorrect. It relies on the Contract Allocation Endorsement's text that the policy must be "constructed" as individual contracts with each insurer. ROA.229. But that very provision shows that there is an overarching contract to which all parties (including the Foreign Insurers) are party—the Insurers and Vinton are collectively agreeing to a contractual provision specifying how the contract is to be interpreted. That provision's purpose, moreover, is to show that the Insurers intended that their respective obligations to

35

Vinton contained within the Policy be several. If the phrase "entirely between American citizens" in § 202 is to mean anything, it must mean that a composite insurance policy that may well have individual subparts is covered by the Convention. And as noted further below, at the very least the arbitration provision—located in the Policy's general Compass Commercial Property Form—was agreed to collectively by all the Insurers and Vinton.

Contrary to the district court's interpretation, the plain language of the Policy shows that it is structured as one overall policy that contains component coverage parts supplied by policies from each Insurer, with each Insurer being severally obligated for its component coverage part. *See* ROA.235, 245–86. This is expressly stated in bold language in the Declarations Page of the Policy, which provides that "[t]his Policy consists of the following coverage parts for which a premium is indicated" and then lists each "commercial property coverage part" supplied by the Insurers. ROA.232. That same Declarations Page is signed by a single employee of the Insurers' program manager—AmRisc, LLC—on behalf of all of the Insurers. ROA.232. There is also a "Contact and Complaints Notice" at the end of the Policy that directs concerns or complaints about

36

the Policy to AmRisc and explains that AmRisc is "the managing general agent and/or Correspondent and/or Program Manager that has placed your *insurance policy*"—singular—"with the insurance carrier(s) listed on your policy declarations page." ROA.321 (emphasis added).

That each Insurer is severally liable for its coverage part is also made plain in § VII(W) in the Compass Commercial Property Form, which is titled "SEVERAL LIABILITY NOTICE":

> The liability of an insurer under this Policy is several and not joint with other insurers party to this Policy. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this Policy.
> The proportion of liability under this Policy underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown in this Policy.

ROA.274.

The Policy's Contract Allocation Endorsement likewise provides that "[t]his insurance is effected with certain insurance underwriters" and that "[t]he liability of each Underwriter on this contract with the Insured is limited to the participation amount shown in the schedule" listed on that page. ROA.235. To reinforce that each Insurer bears several

37

liability for its own coverage part, the Contract Allocation Endorsement provides that "[t]he liability of each separate contract listed and for each Underwriter represented thereby for any loss or losses or amounts payable is several as to each and shall not exceed its participation percentage shown" in a schedule on that page and further provides that "[t]his contract shall be constructed as a separate contract between the Insured and each of the Underwriters." ROA.235.

That the Policy's terms provide it is one overall policy in which each Insurer bears several liability for its own component coverage part is entirely congruent with federal common law. The principles of federal common law are "[o]ften . . . found in the Restatement (Second) of Contracts," *Casa del Caffe*, 816 F.3d at 1212; *see Wallach v. Eaton Corp.*, 837 F.3d 356, 367 (3d. Cir. 2016), and, as highly relevant here, the Restatement provides that "[a] contract may consist of a single promise by one person to another, or of mutual promises by two persons to one another; or there may be, indeed, any number of persons or any number of promises." *Restatement (Second) of Contracts* § 1 cmt. c (1981); *see id.* § 9 cmt. c (illustrating same principle); *Shea v. McCarthy*, 953 F.2d 29, 31 (2d Cir. 1992) ("It is recognized in the common law that a single

contract may be a complex transaction involving multiple promisors and multiple promisees."). And, as a leading treatise provides, "[a] several obligation . . . has the effect of creating two separate liabilities *on a single contract.*" 12 Lord, *Williston on Contracts* § 36.1 (emphasis added)); *see also Adriatic Fire Ins. Co. v. Treadwell*, 108 U.S. 361, 365 (1883) (describing companies' several liability as all being under one contract or agreement); *Restatement (Second) of Contracts* § 288 ("Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.").

The Policy here squarely accords with these principles. It is a single overarching contract in which there are also several component coverage parts, the individual policies issued by the respective insurers. *See Restatement (Second) of Contracts* § 1 cmt. c. The provision that "[t]his contract shall be constructed as a separate contract between the Insured and each of the Underwriters" does not mean the Policy is not a single agreement and is instead only separate contracts. ROA.235. Rather, it shows that the Insurers intended that their respective obligations to Vinton contained within the Policy be several. For example, if one Insurer

defaulted on its obligation, the others would not be liable. Although the Insurers' obligations are separate, black letter law dictates that the Policy remains a single contract or agreement between all of the Insurers and Vinton. *See Adriatic Fire Ins.*, 108 U.S. at 365; 12 Lord, *Williston on Contracts* § 36.1. Because the Policy is a commercial agreement between domestic and foreign entities and contains an arbitration provision, the Convention covers it and mandates arbitration. *See Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 273 (5th Cir. 2002) (quotation omitted).

Further, and as referenced previously, even ignoring that the entire Policy is between domestic and foreign entities, at the very least the arbitration provision was agreed to collectively by all the Insurers— including the Foreign Insurers—and Vinton. The arbitration provision is found not in any individual coverage part, but instead in the Policy's general Compass Commercial Property Form in which all the Insurers are referred to collectively. ROA.245–86. For example, the Compass Commercial Property Form provides, "EXCLUSIONS: The Companies do not insure for loss or damage caused directly or indirectly by any of the following. . . ." ROA.245. And, as directly relevant here, the arbitration

provision in the Compass Commercial Property Form expressly defines "the parties" to the arbitration provision as "the Insured and the *Companies*"—plural. ROA.268 (emphasis added). That is what is necessary to compel arbitration under the Convention—an "agreement in writing to arbitrate the dispute" and "a party to the agreement is not an American citizen." *Francisco*, 293 F.3d at 273; *see Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex)*, 767 F.2d 1140, 1144–45 (5th Cir. 1985). Domestic and foreign entities need not necessarily both be parties to the same contract giving rise to the substantive claims that will be arbitrated. *See Francisco*, 293 F.3d at 273. A leading treatise on international commercial arbitration agrees, explaining that an agreement to arbitrate is "separable" from the "underlying contract" and "the parties' intentions . . . will often be different with regard to their arbitration agreement . . . than with regard to their underlying commercial contracts." *See* 1 Born, International Commercial Arbitration § 10.03, p. 1602. Thus, "there will readily be cases where the parties desire a unified, 'one-stop' dispute resolution mechanism, particularly one extending to all members of a corporate group involved in a particular transaction, without altering the allocations of substantive contractual

41

rights contained in the underlying contracts." *Id.* Thus, at the very least, all the Insurers agreed to the arbitration provision at issue here.

Finally, even if there were any uncertainty about the Convention's application, controlling precedent dictates that the uncertainty be resolved in the favor of the Convention's applicability. There is "a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" that "applies with special force in the field of international commerce." *Mitsubishi Motors*, 473 U.S. at 628–29, 631; *see Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015-16 (5th Cir. 2015) (citing *Mitsubishi Motors*). Thus, this Court has instructed that "doubts as to whether a contract falls under the Convention Act should be resolved in favor of arbitration." *Francisco*, 293 F.3d at 274–75.

As part of its analysis supporting its conclusion that the Policy's arbitration provision was not enforceable under the Convention, the district court stated that the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), "clipped the wings of the oft quoted 'strong federal policy favoring arbitration' created by the FAA" and "explain[ed] that the FAA's policy only makes arbitration agreements as

42

enforceable as other contracts, but not more so, and does not permit federal courts to devise novel rules to favor arbitration over litigation." ROA.727–28 (Op. at 6–7). *Morgan* did not "clip the wings" of the federal policy favoring arbitration. Rather, it was a procedural decision that rejected some circuits' misplaced invocation of that policy to erroneously create "an arbitration-specific waiver rule." *Morgan*, 596 U.S. at 416. The Court thus held that "the FAA's policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Id.* at 418 (quotation omitted).

*Morgan* is not relevant to whether the Convention applies in this case because resolving that issue is not a matter of procedure and does not involve any "special, arbitration-preferring procedural rule[]." *Id.* Instead, it simply entails interpreting the Policy agreed to by the parties and enforcing the arbitration provision contained within it—matters at the core of the federal policy favoring arbitration. *See Mitsubishi Motors*, 473 U.S. at 625–26 ("[T]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, a concern which requires that we rigorously enforce agreements to arbitrate." (quotation omitted)). *Morgan*, moreover, was a purely

43

domestic FAA case and did not address the presumption in favor of enforcing arbitration agreements involving international commerce under the Convention, as the Court had applied in *Mitsubishi Motors.*

The "strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" that "applies with special force in the field of international commerce" thus remains fully applicable here, *Mitsubishi Motors*, 473 U.S. at 631, as does this Court's instruction that "doubts as to whether a contract falls under the Convention Act should be resolved in favor of arbitration," *Francisco*, 293 F.3d at 274.

     **3.**   **Alternatively, under New York law, the Policy is one overarching contract to which all the Insurers agreed.**

As explained above, federal law applies to the interpretation of contracts falling under the Convention and Chapter 2 of the FAA. But even assuming *arguendo* state law instead applies, the choice of law clause in the Policy requires New York law. Specifically, the Policy provides that the "seat of the Arbitration shall be in New York and the Arbitration Tribunal shall apply the law of New York as the proper law of this insurance." ROA.268. Further, as explained in Section III below,

neither Louisiana Revised Statutes § 22:868(A)(1) nor § 9:2778 prohibit the arbitration provision's choice of law clause.

The principles of New York contract law applicable here are much the same as the principles of federal law described above and likewise provide that the Policy is one agreement to which all the Insurers are parties. Under New York law, "[g]enerally, all contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction." *Applehead Pictures LLC v. Perelman*, 80 A.D.3d 181, 188–89 (N.Y. App. Div. 2010) (quotation omitted); *TBS Enters., Inc. v. Grobe*, 114 A.D.2d 445, 446 (N.Y. App. Div. 1985). This rule applies "even though in one of the contracts it is stated that there are not other contracts between the parties, or such contract does not refer in terms to the other." *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 439 (N.Y. App. Div. 1981) (citations omitted). In contrast, "separate written agreements involving different parties, serving different purposes and not referring to each other [are] not intended to be interdependent or somehow combined to form a unitary contract." *Applehead*, 80 A.D. 3d at 189 (alteration in original) (quotation omitted). At bottom, New York law

45

focuses primarily on "the intent manifested, viewed in the surrounding circumstances" and places emphasis on "whether the parties assented to all the promises as a whole, so that there would have been no bargain if any promise or set of promises had been stricken." *Williams*, 83 A.D.2d at 439–40.

Here, the Policy's terms show that the intent of the parties' agreement depended on the involvement of *every* Insurer, and without each Insurer's involvement, the transaction would have failed. Indeed, each Insurer provided, and is severally liable for, its own component coverage part, and the overarching coverage sold to Vinton was the combination of all these coverage parts. This entailed, moreover, one transaction in which the Insurers' program manager, AmRisc, signed the Declarations Page on behalf of the all the Insurers. ROA.398. Under New York law, the Policy is therefore one agreement to which all the Insurers agreed. *See Applehead*, 80 A.D.3d at 188–89; *Williams*, 73 A.D.2d at 439.[3]

---

[3]    In no event would Louisiana law be the appropriate law to apply here. But even under Louisiana law, the Policy would be one agreement to which all the Insurers agreed. Under Louisiana law, "whether an obligor may be held for the whole or for only a proportionate part of the obligation is essentially whether the two obligors each promised the same or full performance or whether each promised only a different performance, that is to pay a proportionate part of the liability." *Transit Mgmt. of Se. La., Inc. v. Grp. Ins. Admin., Inc.*, 226 F.3d 376, 386 (5th Cir. 2000)

**C. Even if the Insurers' contracts were considered to be only separate, equitable estoppel would still mandate arbitration under the Convention.**

**1. *Bufkin* is dispositive of this case.**

Even accepting the district court's conclusion that the Insurers' contracts are all separate, the doctrine of equitable estoppel would still mandate arbitration under the Convention. In *Bufkin*, this Court held in nearly identical circumstances that an identical arbitration provision in a substantively identical surplus lines policy—involving most of the same Insurers present here—must be enforced through the Convention and equitable estoppel under federal law and that the same district court judge here abused his discretion in not compelling arbitration on that basis. *Bufkin*, 96 F.4th at 729–33. This Court, applying its decision in *Grigson*, held that equitable estoppel required the district court to compel arbitration under the Convention, regardless of whether the policy was composed of a single contract or multiple contracts. *Bufkin*, 96 F.4th at 731. *Bufkin*'s analysis focused primarily on (1) Bufkin's allegations of

---

(quoting *Flintkote Co. v. Thomas*, 223 So. 2d 676, 678 (La. Ct. App. 1969)). Under this framework, "[several] obligations, *although they may be contained in the same contract,* are considered as much individual and distinct as if they had been in different contracts and made at different times." *Id.* (quoting *Flintkote Co.*, 223 So. 2d at 678) (emphasis added). Thus, under Louisiana law, a contract containing multiple parties and several obligations remains one unified agreement. *See id.*

47

substantially interdependent and concerted conduct as to both the foreign and domestic insurers; (2) Bufkin's failure to identify any "wholly separate" conduct on the part of the foreign or domestic insurers; and (3) Bufkin's submission of its insurance claim to *all* insurers, both foreign and domestic. *Id.* at 730–33.

*Bufkin*'s holding is dispositive here. Like the plaintiff in *Bufkin*, Vinton alleged "substantially interdependent and concerted conduct by the domestic and foreign insurers" and failed to "differentiate between conduct of foreign and domestic insurers." *Id.* at 731. In fact, Vinton's petition consistently referenced conduct by "the Insurance Companies" collectively, which included both the Foreign Insurers and Domestic Insurers, ROA.22–24, and sought relief against all Insurers, including the Foreign Insurers, ROA.24–25. At no point did Vinton identify any "wholly separate" conduct on the part of specific Insurers. ROA.21–24. Vinton's petition even acknowledged that it submitted its claims as to *all* Insurers and those claims were *all* adjusted by Sedgwick Claims Management Services, Inc. under a single Sedgwick file number. ROA.23. Therefore, even if—contrary to the facts—the Insurers' contracts with Vinton were found to be only separate contracts, and

somehow the Convention does not directly apply by its text, Vinton has "raise[d] allegations of substantially interdependent and concerted misconduct by both the [D]omestic Insurers and the [F]oreign Insurers" that would make the Convention applicable to the Domestic Insurers' agreements by virtue of equitable estoppel. *Bufkin*, 96 F.4th at 731 (quotation omitted); *see also LMP Props., L.L.C. v. Interstate Fire & Cas. Co.*, No. 23-30833, 2024 WL 2988938, at *1 (5th Cir. June 14, 2024) (unpublished) (per curiam) (following *Bufkin* in similar case and holding that the "Convention applies despite Appellees' dismissal of claims against the foreign insurers").

Furthermore, in *Bufkin*, this Court observed how the plaintiff began by suing only domestic insurers but then amended its petition to name the foreign insurers, expressly "for the purpose of then dismissing the foreign insurers with prejudice[,] foregoing [sic] any rights against them[.]" *Id.* at 728 (alterations in original) (quotation omitted). Throughout its amended petition, Bufkin repeatedly "alleged that *all* the insurers engaged in the same conduct" but nevertheless "contemporaneously filed a separate motion for dismissal with prejudice of the foreign insurers, which the state court granted." *Id.* at 728

49

(emphasis in original). This Court rejected the ruse: "[t]he upshot is that indulging Bufkin's pleading-and-then-dismissing gamesmanship by denying arbitration turns on its head the axiom that [t]he linchpin for equitable estoppel is equity—fairness. *Id.* at 732 (second alteration in original) (quotation omitted).

As in *Bufkin*, Vinton also engaged in procedural gamesmanship specifically designed to avoid arbitration. Specifically, only days after filing its petition, Vinton dismissed its claims against the Foreign Insurers in a transparent attempt to avoid invoking the Convention. ROA.183–84. The gamesmanship is further laid bare by Vinton's request that the state court's clerk *not* attempt to serve its petition on any of the Insurers until *after* Vinton had already dismissed the Foreign Insurers. ROA.329. Vinton then referenced the fact that the Foreign Insurers— whom Vinton requested the clerk not serve—had yet to answer or otherwise appear as support for Vinton's motion to dismiss them. ROA.183. Vinton then relied upon the state court's dismissal of the Foreign Insurers throughout its opposition to the Insurers' motion to compel arbitration. ROA.345, 351–355 (emphasizing that as a result of the dismissal with prejudice, the Foreign Insurers "can never be

50

responsible for payment of any amount whatsoever to Vinton on this policy").

The district court's order denying arbitration also relied heavily on Vinton's procedural gamesmanship in distinguishing the facts here from those in *Grigson* and concluding that "equitable estoppel is not warranted." ROA.730–31 (Op. at 9–10) (distinguishing dismissal without prejudice in *Grigson* from Vinton's dismissal with prejudice). But, while Vinton as master of its complaint "was certainly free to name and then dismiss the [F]oreign [I]nsurers, the district court was not free to *disregard* them in considering the [D]omestic [I]nsurers' motion to compel arbitration." *Bufkin*, 96 F.4th at 732. By "focusing on [Vinton's] dismissal of the foreign insurers, the district court neglected to consider the [F]oreign [I]nsurers' part in the seamless coverage agreement stuck by the parties." *Id.* The district court's "fail[ure] to apply *Grigson's* interdependent and concerted misconduct test" was an abuse of discretion. *Id.* (quoting *Grigson*, 210 F.3d at 527).

Last, the Court in *Bufkin* expressly rejected Bufkin's contention that enforcing the Convention through equitable estoppel "run[s] against Louisiana public policy." *Id.* (quotation omitted). The Court explained

51

that the "Convention is an exception to Louisiana's general bar on policy terms that deprive its state courts of jurisdiction and venue in actions against insurer" and that in *Safety National*, the Court "already held that § 22:868 does not reverse preempt the Convention because the McCarran-Ferguson Act does not apply to treaties." *Id.* (citing *Safety Nat'l*, 587 F.3d at 718). "In other words, § 22:868 does not come into play." *Id.* This holding applies equally here and illustrates how the certified question in *Calcasieu Parish* regarding Louisiana law equitable estoppel is irrelevant to this case.

### 2. *Bufkin* correctly recognized that federal common law governs equitable estoppel under the Convention.

In *Bufkin*, this Court correctly recognized federal common law governs the application of equitable estoppel to enforce the Convention. At bottom, the Court's equitable estoppel analysis rested on *Grigson*, a case that indisputably applied equitable estoppel under federal common law. *See Grigson*, 210 F.3d at 527–28. The *Bufkin* Court discussed Louisiana case law applying *Grigson* in addition to *Grigson* itself, but its holding was based on *Grigson* alone: "The district court failed to apply *Grigson*'s 'interdependent and concerted misconduct' test," and "[t]his was an abuse of discretion." *Bufkin*, 96 F.4th at 733 (citing *Grigson*, 210

52

F.3d at 528). And in support of its equitable estoppel analysis, the Court also cited its decision in *Brown v. Pacific Life Insurance Co.*, 462 F.3d 384 (5th Cir. 2006), which followed *Grigson* and analyzed equitable estoppel as a matter of federal law. *See Bufkin*, 96 F.4th at 731 n.4; *Brown*, 96 F.4th at 398–99. This citation would make no sense if the Court were applying equitable estoppel under Louisiana law. Moreover, the Louisiana cases cited by the Court just entailed applications of *Grigson*. *See Pontchartrain Nat. Gas. Sys. v. Tex. Brine Co.*, 317 So. 3d 715, 743–45 (La. Ct. App. 2020); *Sturdy Built Homes, L.L.C. v. Carl. E. Woodward L.L.C.*, 82 So. 3d 473, 478 (La. Ct. App. 2011).

In contrast to the federal equitable estoppel applied in *Bufkin*, the question certified to the Louisiana Supreme Court in *Calcasieu Parish* regarding equitable estoppel specifically asked whether Louisiana state law permitted an insurer to use equitable estoppel to enforce an arbitration provision in another insurer's policy, and the Louisiana Supreme Court's opinion accordingly only discussed equitable estoppel under Louisiana law. *Calcasieu Par.*, 395 So. 3d at 722, 728–30. The Louisiana Supreme Court's "disagree[ment]" with this Court's decision in *Bufkin* stemmed from its mistaken belief that *Bufkin* applied equitable

estoppel under Louisiana law. *See id.* at 729 ("We find this conclusion flawed and not supported by Louisiana law."). The Louisiana Supreme Court's rulings on equitable estoppel are therefore wholly irrelevant here.

Moreover, the *Bufkin* Court's application of equitable estoppel under federal common law was entirely correct. As discussed above in Section II.A.1.b., issues concerning the formation and interpretation of arbitration agreements under the Convention comfortably meet each part of the *Boyle* test for enacting federal common law because (1) there are "uniquely federal interests" involved and (2) a "significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation," as the Convention and Chapter 2 demand uniform interpretation to effectuate the Convention's purposes. *Boyle*, 487 U.S. at 507 (alteration in original) (quotation omitted). Whether non-signatories of an arbitration agreement may enforce the Convention through equitable estoppel is one of the issues of contractual formation and interpretation that is governed by federal common law. *See Setty*, 3 F.4th at 1168 ("In cases involving the New York

54

Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, we apply federal substantive law, for which we look to ordinary contract and agency principles." (quotations omitted)); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 373–75 (4th Cir. 2012) (applying federal common law equitable estoppel post-*Arthur Andersen* in affirming a district court's order compelling arbitration under the Convention); *Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring). And as this Court has held more generally, "whether equitable estoppel will lie in an action based upon federal law is a question to be determined with reference to the federal law of estoppel." *Mangaroo v. Nelson*, 864 F.2d 1202, 1205 n.3 (5th Cir. 1989).

Further, in addition to uniform interpretation and application of the Convention and Chapter 2 of the FAA being necessary to effectuate the Convention's purposes, there is also a "more narrow" but "significant conflict" that exists between the provisions of the Convention and Chapter 2 of the FAA demanding that arbitration agreements be enforced and the anti-arbitration provisions contained in Louisiana Revised Statutes § 22:868 and § 9:778. *Boyle*, 487 U.S. at 507. As a result, these

anti-arbitration "elements of [the statutes] are superseded." *Id.* (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595 (1973)).

Nor is the conclusion that federal common law governs equitable estoppel under the Convention affected by the Supreme Court's decision in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432 (2020). In *GE Energy*, the Court reversed a decision of the Eleventh Circuit holding that the Convention could only be enforced by parties that actually signed the arbitration agreement and that the Convention could not be enforced by nonsignatories through equitable estoppel. *Id.* at 439–41, 445. The Court's holding was limited, as it emphasized that it "[held] only that the New York Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines." *Id.* at 445. Indeed, the Court expressly stated that it was not determining "which body of law governs" the application of domestic equitable estoppel and that that issue "can be addressed on remand" by the Eleventh Circuit. *Id.* Whether federal or state law governs the application of equitable estoppel was therefore simply not decided in *GE Energy*. *See Jiangsu Beier Decoration Materials Co. v.*

56

*Angle World LLC*, 52 F.4th 554, 562 n.32 (3d Cir. 2022) (stating that GE Energy Court "declined to determine which body of law courts should apply" for equitable estoppel under the Convention (quotation omitted)); 1 Born, *International Commercial Arbitration* § 10.05[A], p. 1610 n.492 (describing the GE Energy Court as "leaving open question of which body of law governs application of non-signatory theory" (quotation omitted)).

Indeed, on remand in the Eleventh Circuit after *GE Energy*, Judge Tjoflat specially concurred in the court's opinion by stating that the Supreme Court gave the Eleventh Circuit the "clear directive" to determine whether state or federal law applied to the non-signatory's attempt to enforce the Convention through equitable estoppel. *Outokumpu*, 2022 WL 2643936, at *5 (Tjoflat, J., specially concurring). Judge Tjoflat then concluded that "the *Boyle* test counsels in favor of applying federal common law to threshold questions of arbitrability, which include the application of equitable estoppel to GE Energy's attempt to compel arbitration as to Outokumpu." *Id.* at *6.

Other post-*GE Energy* courts and commentators have likewise concluded that federal common law determines whether a party may enforce an arbitration provision through the use of equitable estoppel.

57

*See Setty*, 3 F.4th at 1168; *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 736–37 (N.D. Cal. 2023); Meshel, *supra*, at 146 ("[T]hat international commercial arbitration agreements are governed exclusively by the Convention and the FAA in turn renders them so dominated by the sweep of federal statutes and doctrines ... that the legal relations they affect must be deemed governed by federal law" and, therefore, "issues concerning such agreements, including the application of equitable estoppel by or against non-signatories, are more appropriately governed by federal rather than state law" (quotation omitted)); 21 Lord, *Williston on Contracts* § 57:61; 1 Born, *International Commercial Arbitration* § 10.05[A], p. 1610 ("[T]he Court in *Arthur Andersen* did not address the application of the New York Convention or Chapter 2 of the FAA, where the better view, generally adopted by U.S. lower courts, remains that federal common law should govern issues of alter ego, agency, estoppel and the like.").

**3.** **If any State's law of equitable estoppel is to apply, it is New York's, which mandates arbitration under the Convention.**

Federal common law governs the application of equitable estoppel under the Convention and Chapter 2 of the FAA. But even assuming

*arguendo* state law is instead applicable, New York law should apply under the Policy's choice of law clause. *See* ROA.268. As with federal common law, equitable estoppel under New York law would also mandate the enforcement of the Convention.

Under New York law, that "a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." *Degraw Constr. Grp., Inc. v. McGowan Builders, Inc.*, 152 A.D.3d 567, 569–70 (N.Y. App. Div. 2017) (quotation omitted). In *Degraw*, the appellate court compelled a signatory plaintiff to arbitration with a nonsignatory defendant based on a broad arbitration clause which applied to "[a]ll claims, disputes and other matters arising out of or relating to [the agreement], or the breach thereof." *Degraw*, 152 A.D.3d at 569. The signatory plaintiff filed suit against the signatory defendant (McGowan Builders) and also against multiple nonsignatories who were employees of McGowan Builders. *Id.* at 570. The appellate court determined that under those circumstances, "the individual defendants were entitled to

59

enforce the arbitration provision contained in the subcontract agreement between McGowan Builders and the plaintiff." *Id.*

Likewise, in *Revis v. Schwartz*, 192 A.D.3d 127 (N.Y. App. Div. 2020), *aff'd*, 38 185 N.E.3d 496 (N.Y. 2022), the appellate division permitted a nonsignatory to compel arbitration in a contract dispute between professional football player Revis and his representation, Schwartz & Feinsod, LLC ("S&F"), determining that any outstanding questions of arbitrability should be resolved by the arbitrator. Revis had previously entered into an arbitration agreement with defendant signatory Schwartz (a named partner of S&F); after becoming dissatisfied with his representation, Revis filed suit against Schwartz, S&F, and another named partner, Feinsod. *Id.* at 143. The appellate division confirmed that, although nonsignatories, Feinsod and S&F were nonetheless able to enforce the arbitration provisions in part because "the allegations in the complaint which were made against S&F and Feinsod relate solely to work that was done on behalf of Schwartz." *Id.* at 143–44. The New York Court of Appeals affirmed, specifically holding that "[b]ased on the allegations in the complaint, alleging intertwined claims of breach of fiduciary duty, unjust enrichment, and equitable fraud and

seeking recission of all the parties' agreements . . . the Appellate Division properly concluded that the gateway questions of arbitrability should be resolved by the arbitrator." *Revis v. Schwartz*, 185 N.E.3d 496, 496 (N.Y. 2022).

Furthermore, federal courts sitting in diversity jurisdiction have made *Erie* guesses that "the New York Court of Appeals would recognize estoppel as a ground by which a non-signatory can compel a signatory to arbitrate." *Gov't Emps. Ins. Co. v. Grand Med. Supp., Inc.*, No. 11 CIV. 5339 BMC, 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012) (collecting cases); *accord 5556 Gasmer Mgmt. LLC v. Underwriters at Lloyd's, London*, 463 F. Supp. 3d 785 (S.D. Tex. 2020) ("The parties purport to dispute whether Texas or New York law applies to this question. Yet the contract law of both states provides for equitable estoppel theories.")

As explained previously, Vinton alleged substantially interdependent and concerted conduct by the domestic and foreign insurers and failed to differentiate between conduct of foreign and domestic insurers. ROA.21–25. Under New York law, equitable estoppel is warranted to enforce the Convention and compel arbitration. *See Revis*,

61

192 A.D.3d at 143–44; *Degraw*, 152 A.D.3d at 570; *Gov't Emps.*, 2012 WL 2577577, at *3.

### D. At a minimum, the arbitration provision's delegation clause requires the Court to compel arbitration.

Even if there were any uncertainty about the enforceability of arbitration provision, the Policy's delegation clause makes it so the Arbitration Tribunal should resolve it.

"[A] valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016). The Policy's arbitration provision includes the following delegation clause: "All matters in difference between the Insured and the Companies . . . in relation to this insurance, including its formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out." ROA.268. Multiple courts have recognized that this language constitutes a delegation clause. *See 5556 Gasmer Mgmt.*, 463 F. Supp. 3d at 788, 790 (collecting cases interpreting identical language).

"[I]f the party seeking arbitration points to a purported delegation clause, the court's analysis is limited" and entails two steps. *Kubala*, 830

F.3d at 202. The first step "is contract formation—whether the parties entered into *any arbitration agreement at all.*" *Id.* at 201. As to the second step, "the only question . . . is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.*

Application of the two steps here shows that any uncertainty about the validity of arbitration provision's enforceability should be resolved by the Arbitration Tribunal. As to the first step, there is indisputably a contractual agreement to arbitrate. ROA.268. As to the second step, the arbitration provision's delegation clause covers all conceivable disputes relating to the Policy, including issues of "formation and validity." ROA.268. It is thus for the Arbitration Tribunal to decide whether the Domestic Insurers and Foreign Insurers are all parties to the Policy or whether the Domestic Insurers are entitled to enforce the Convention through equitable estoppel. Because "there is a delegation clause, the motion to compel arbitration should be granted" without more. *Kubala*, 830 F.3d at 202.

### III. Contrary to the district court's findings, neither Louisiana Revised Statutes § 22:868(A)(1) nor § 9:2778 prohibit the arbitration provision's choice of law clause.

As a last-ditch effort to avoid arbitration, Vinton argued—and the district court agreed—that Louisiana Revised Statutes § 22:868(A)(1) and/or § 9:2778 prohibit the arbitration clause's choice of law provision. ROA.738 (Op. at 17). Assuming this Court agrees with the Domestic Insurers, the Court should vacate this holding in compelling arbitration. As explained above, that is at the very least a delegated question for the arbitration tribunal to decide. The Court should go no further. *See also Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409, 412 (5th Cir. 1984) (per curiam) (in affirming district court's order compelling arbitration, refraining from deciding that Texas law applied to the dispute and concluding that it was appropriate for the arbitrator to determine "whether there [was] reason to ignore the choice-of-law clause agreed to by the parties").

In any event, the Policy's choice of law clause is valid. The Convention preempts both § 22:868(A)(1)'s bar on foreign choice of law clauses as well as that found in § 9:2778. *Safety Nat'l*, 587 F.3d at 732 (§ 22:868 does not reverse-preempt the Convention); Convention art. II,

1970 WL 104417, at *1 (court of contracting state shall refer parties to arbitration in accordance with terms of arbitration agreement). As this Court explained in *Bufkin,* "§ 22:868 does not reverse preempt the Convention because the McCarran-Ferguson Act does not apply to treaties." *Bufkin,* 96 F.4th at 732 (citing *Safety Nat'l,* 587 F.3d at 718). What's more, McCarran-Ferguson reverse-preemption does not even apply to § 9:2778. In contrast to § 22:868, § 9:2778 does not even purport to specifically regulate the business of insurance. Indeed, § 9:2778 is found in Chapter 3 of Title 9 of the Louisiana Revised Statutes, which specifically related to the "Performance of Obligations."

Furthermore, this Court has already determined that the FAA preempts a highly similar provision in Title 9 of the Louisiana Revised Statutes. *See OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 447 (5th Cir. 2001) (concerning Louisiana Revised Statutes § 9:2779). In *OPE*, this Court held that § 9:2779—which "declares null and void and unenforceable as against public policy any provision in [certain construction subcontracts] . . . which [ ] [r]equires a suit or arbitration proceeding to be brought in a forum or jurisdiction outside of [Louisiana]"—directly conflicted with § 2 of the FAA because it

65

"condition[ed] the enforceability of arbitration agreements on selection of a Louisiana forum," which was not "a requirement . . . applicable to contracts generally." *OPE,* 258 F.3d at 447 (modifications in original) (quotation omitted). The same analysis holds here.

## CONCLUSION

This Court should reverse the district court's order denying the motion to compel arbitration and stay proceedings pending arbitration.

Respectfully submitted,

*/s/Raffi Melkonian*
Raffi Melkonian
Thomas C. Wright
Eric B. Boettcher
Landon J. Francois
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas  77056
(713) 572-4321
(713) 572-4320 (Fax)
melkonian@wrightclosebarger.com
wright@wrightclosebarger.com
boettcher@wrightclosebarger.com
francois@wrightclosebarger.com

Sean P. Mount
Bryce M. Addison
DEUTSCH KERRIGAN, LLP
755 Magazine Street
New Orleans, Louisiana 70130
(504) 593-0669
(504) 566-4073 (Fax)

smount@deutschkerrigan.com
baddison@deutschkerrigan.com

***Attorneys for Defendants—
Appellants***

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2025, I electronically transmitted the attached Appellants' Brief to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF System, which sent a Notice of Electronic Filing to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Raffi Melkonian*
Raffi Melkonian

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font for text and Century Schoolbook 12-point font for footnotes.

*/s/ Raffi Melkonian*
Raffi Melkonian